UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUN 28  A 11: 44

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| CONCEPTS ETI, INC. d/b/a CONCEPTS NREC, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Docket No. |
| ANTHONY F. KAVANAUGH, JR. d/b/a DCA ENGINEERING, ) ) ) | 04-11465 RGS |
| Defendants. ) | |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65, Plaintiff Concepts ETI, Inc. d/b/a Concepts NREC ("Concepts"), through its attorneys Downs Rachlin Martin PLLC, requests that this Court preliminarily enjoin Defendant Anthony K. Kavanaugh, Jr. d/b/a DCA Engineering ("Kavanaugh") from divulging Concepts' confidential and proprietary information and trade secrets (collectively, Concepts' "confidential information") to any party without Concepts' written authorization. Concepts also seeks an injunction prohibiting Kavanaugh from competing against Concepts by using Concepts' own confidential information against it. In addition, Concepts seeks an order requiring Kavanaugh to return any and all documents and confidential and proprietary information of any nature pertaining to his work at Concepts. As grounds for this Motion, Concepts states as follows and refers the Court to Plaintiff's Verified Complaint.

I.    FACTUAL BACKGROUND

   A.    Introduction

The present action, and this request for preliminary injunctive relief, arises out of the Defendant's unauthorized use of Concepts' confidential information to secretly compete against

DOWNS
RACHLIN
MARTIN PLLC

Concepts while Defendant was employed by Concepts. The relevant facts are set forth in the accompanying Verified Complaint. Kavanaugh was employed by Concepts until May 27, 2004. Unbeknownst to Concepts, Kavanaugh sent correspondence to one of Concepts' long-standing customers (the U.S. Army) on or about May 15, 2004. In this correspondence, Kavanaugh divulged the fact that Concepts was contemplating a price increase in the services it rendered to the Army. Kavanaugh offered to provide the same services to the Army, for a lower price, through a business entity apparently operated by Kavanaugh, DCA Engineering. Concepts was unaware that Kavanaugh was attempting to undercut its long-standing contractual relationship with the Army in this manner, and never authorized Kavanaugh to disclose its confidential pricing information to the Army. Concepts eliminated Kavanaugh's position on May 27, 2004, and accordingly advised Kavanaugh that he was terminated as of that date. At the time of Kavanaugh's termination, Concepts was unaware of Kavanaugh's May 15, 2004, correspondence to the Army and was unaware that Kavanaugh was secretly competing with Concepts. Subsequent to May 27, 2004, the Army advised Concepts of the existence and contents of the May 15, 2004, letter from Kavanaugh. As a result of Kavanaugh's outrageous actions while still employed by Concepts, Concepts' longstanding relationship with the Army has suffered, and the Army has indicated that it will entertain a competing bid from Kavanaugh and DCA Engineering. By the present Motion, Concepts respectfully requests that this Court issue an Order preliminarily enjoining Kavanaugh from continuing his unfair, improper and unlawful actions. In particular, Concepts requests an Order that: (1) enjoins Kavanaugh from <u>divulging</u> any of Concepts' confidential information to third parties without express, written authorization from Concepts, and (2) enjoins Kavanaugh from <u>using</u> any of Concepts'

confidential information in competing against Concepts. Concepts also seeks the return of any and all of its confidential information in the possession of Kavanaugh.

B.  Concepts' Business

As described in its Verified Complaint, Concepts is a Vermont corporation having its principal place of business in White River Junction, Vermont. Verified Complaint ("V.C.") ¶ 1. In addition to its facility in Vermont, Concepts also maintains a facility in Woburn, Massachusetts. V.C. ¶ 11. Concepts is in the business of providing engineering services in connection with the design and development of industrial turbomachinery, such as compressors, pumps, blowers, fans, turbines, and expanders. V.C. ¶ 6. In connection with this, Concepts has been designing, building and overhauling Dynamometers for approximately twenty years. Concepts has accumulated a wealth of experience and knowledge over the course of its years building and overhauling Dynamometers. V.C. ¶ 7. Through numerous design changes, process changes and other experiences, Concepts has developed information regarding the best methods for designing, building and overhauling Dynamometers. Id.

As a result of this experience and its dedication to high quality service, Concepts has developed a loyal client base. V.C. ¶ 8. One of Concepts' best clients is the United States Army. The Army, which has been a client of Concepts' Dynamometer services for almost twenty years, expends in excess of $150,000 per year for Concepts' services. V.C. ¶ 9. In fact, Concepts has been the Army's sole supplier of Dynamometer overhaul services for a number of years. V.C. ¶ 26. As described below, because of Kavanaugh's unlawful actions, this position has now been threatened. Id.

C.  Defendant's Employment At Concepts And The Confidentiality Agreement

Defendant Kavanaugh is a resident of Uxbridge, Massachusetts. V.C. ¶ 2. Concepts hired Kavanaugh on or about December 12, 2001, to work as a production controller in Concepts' Woburn facility. V.C. ¶¶ 10-11. As production controller, Kavanaugh was responsible for opening up work orders, scheduling work on the shop floor, insuring that necessary materials were ordered in advance of the scheduled work, forecasting work orders, closing out work orders, and generally supporting others in building and overhauling Concepts Dynamometers as well as other products. V.C. ¶ 11. Kavanaugh was provided access to confidential and proprietary information, including pricing information, business and marketing information, development plans, and proprietary information regarding procedures and processes for Dynamometer overhauls. V.C. ¶ 12. Kavanaugh also had access to Concepts' customer lists, contact information, and customer files. Id.

Because of the free access to confidential information that Kavanaugh would have by virtue of his position at Concepts, Kavanaugh entered into a comprehensive Confidentiality and Nondisclosure Agreement with Concepts prior to the commencement of his employment. Pursuant to this Agreement (which is attached as Exhibit A to Plaintiff's Verified Complaint), Kavanaugh was (and is) prohibited from divulging any of Concepts' confidential information to individuals or entities outside of the company unless specifically authorized. V.C. ¶ 13. In particular, the Agreement provides, in part:

> As an employee engaged by Concepts ETI, Inc. (CETI or "the Company"), for salary and other benefits, to perform services for the Company, you may learn and make use of sensitive and commercially valuable business and technical information which is confidential in nature and in some cases constitutes trade secrets and practices of CETI or CETI's clients ("Confidential Technology and Information"). By your signature below you recognize CETI's legitimate interest in protecting Confidential Technology and Information and understand that this

Agreement forms a part of the basis of CETI's willingness to employ you, or to contribute to employ you.

V.C. ¶ 14. The Agreement broadly defines "Confidential Technology and Information" to include: "business, marketing, and advertising information and plans; customer, vendor, or consultant identifications; development plans; product information; information concerning the nature or direction of research and development activities; . . . All of these materials, and other materials which by their use or nature become known to you (or should be known to you) as confidential, shall constitute the Confidential Technology and Information, regardless of how you come to know of them." V.C. ¶ 15. Accordingly, the Agreement plainly includes such sensitive information as customer lists and identifications, pricing information, and business processes. The Confidentiality and Nondisclosure Agreement then specifically prohibits Kavanaugh from disclosing or using any confidential information to third parties without Concepts' authorization, stating:

> In consideration of your employment . . . by CETI, and the mutual covenants herein contained, CETI and you hereby agree as follows:
> . . .
> . . . Except as may be required by your employment at CETI, you will not, without CETI's written consent, disclose or use, nor solicit nor assist another to use or disclose, at any time either during or subsequent to your employment by CETI, any Confidential Technology and Information of CETI, or CETI's clients or business parties, of which you become informed during your employment.

V.C. ¶ 16. The Agreement could not be any more clear in its prohibition on disclosure or use of confidential information. Significantly, the Agreement goes on to provide:

> . . . The undersigned employee understands that money damages may not adequately compensate CETI for any violation of this Agreement, or that money damages may not be readily calculable, and CETI therefore also reserves, in addition to all rights it has and may have in law or in equity, the right to enjoin, or seek damages or other remedies for, any actions violating this Agreement.

DOWNS
RACHLIN
MARTIN PLLC

5

Id. This Confidentiality and Nondisclosure Agreement was signed by Kavanaugh on November 27, 2001, and was countersigned, and therefore fully executed, by Concepts on December 7, 2001. V.C. ¶ 17. Kavanaugh worked for Concepts until May 27, 2004, at which time his position was eliminated for business reasons and his employment at Concepts was terminated. V.C. ¶ 18.

### D. Defendant's Violation Of The Confidentiality Agreement And His Attempts To Sabotage Concepts' Business

Several weeks after Kavanaugh's departure from Concepts, representatives from Concepts contacted the Army to discuss a proposed price increase for certain Dynamometer services that Concepts provides to the Army. V.C. ¶ 19. Specifically, on June 17, 2004, Concepts' Ed Killackey contacted Earl Gard with the U.S. Army to broach the subject of the proposed price increase. In a telephone call with Mr. Gard, Mr. Killackey explained the price increase and the rationale behind the increase. After listening to Mr. Killackey's explanation, Mr. Gard advised Mr. Killackey that the Army had received correspondence from an entity named DCA Engineering on May 15, 2004. V.C. ¶ 20. As relayed by Mr. Gard, DCA Engineering is located in Uxbridge, Massachusetts, the same town where Defendant Kavanaugh resides. Id. Mr. Gard went on to discuss the contents of this correspondence, explaining that Defendant Anthony Kavanaugh, who was still working for Concepts as of May 15, 2004, was affiliated with DCA Engineering and that Mr. Kavanaugh had in fact held himself out to Mr. Gard as a representative of that entity. Mr. Gard stated that the May 15, 2004 correspondence specifically forewarned of Concepts' price increase (a closely held secret) and solicited the Army's Dynamometer overhauling business; business that was then being handled by Concepts. V.C. ¶ 21.

The May 15, 2004, correspondence from "DCA Engineering" to the Army reveals that Defendant Kavanaugh divulged Concepts' confidential and proprietary information without Concepts' authorization. V.C. ¶ 23. Indeed, at a bare minimum, Kavanaugh used Concepts' customer identification information, contact information, and pricing information without Concepts' authorization, all to Concepts' extreme detriment. What is even more egregious is the fact that, given the date of the correspondence, it is evident that Kavanaugh divulged this confidential information while still employed by Concepts. Id. Further, Defendant Kavanaugh held himself out to Concepts' client, the Army, as representing DCA Engineering. The correspondence from DCA Engineering was an open attempt to undercut Concepts' relationship with its client, and was an attempt to attract the Army's business away from Concepts. By virtue of holding himself out as a representative of DCA Engineering, Defendant Kavanaugh was directly competing with Concepts, without Concepts' knowledge, at a time when Kavanaugh was employed by Concepts. V.C. ¶ 24.

E.  The Effect Of Kavanaugh's Actions On Concepts

Kavanaugh's attempt to undermine Concepts' relationship with the Army (and potentially other clients), and his use of Concepts' confidential and proprietary information to further his attempts to sabotage Concepts' business, has in fact injured Concepts' business and is in blatant breach of law. V.C. ¶ 25. Although the damages to Concepts flowing from Kavanaugh's actions cannot be ascertained with precision at this time, potential damages reach into the millions of dollars. As stated above, Concepts does approximately $150,000 per year of work for the Army. While Concepts and the Army had previously enjoyed a close relationship, and while the Army had viewed Concepts as a sole source supplier of Dynamometer overhauling services, the Army has now questioned that privileged position by virtue of Kavanaugh's improper actions and has

indicated that it will entertain bids from other suppliers. The relationship between Concepts and the Army has therefore already been damaged. If Concepts loses the Army as a client, the value of the lost future profits will likely be in the millions. V.C. ¶ 26. Moreover, because of the surreptitious nature of Kavanaugh's improper activities, it is unknown what other of Concepts' clients have been approached by Kavanaugh using Concepts' own confidential and proprietary information. Depending upon the extent of Kavanaugh's use of Concepts' trade secrets, the potential damage to Concepts may be extremely substantial, well into the millions of dollars. V.C. ¶ 27. If Kavanaugh's actions are not enjoined at this time, and he is allowed to continue to divulge and use Concepts' confidential information against Concepts, the damage will be irreparable.

II. ARGUMENT

    A.    Legal Standards

In assessing a request for a preliminary injunction, a court must weigh four factors:

> (1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, i.e. the hardship to the nonmovant if the injunction issues as contrasted with the hardship to the movant if interim relief is withheld; and (4) the effect on the public interest of a grant or denial of the injunction.

DeNovellis v. Shalala, 135 F.3d 58, 62 (1st Cir. 1998). The First Circuit Court of Appeals has often stated that the most important factor in this calculus is the movant's likelihood of success at trial. See Cohen v. Brown Univ., 991 F.2d 888, 902 (1st Cir. 1993) (citing Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991); Public Serv. Co. v. Town of West Newbury, 835 F.2d 380, 383 (1st Cir. 1987)); see also Gately v. Commonwealth of Massachusetts, 2 F.3d 1221, 1224-25 (1st Cir. 1993) ("the sine qua

non of the preliminary injunction standard is whether the plaintiffs are likely to succeed on the merits").

B. Concepts Is Likely To Succeed On The Merits

The facts of this matter demonstrate that Concepts is almost certain to succeed on its claims against Kavanaugh. One of Concepts' most highly-valued clients, the Army, received correspondence on May 15, 2004, advising them of Concepts' intent to increase the price of the services it provides. V.C. ¶¶ 20-24. Concepts itself had not provided this information to the Army, and Mr. Gard from the Army essentially confirmed that the information was received from Kavanaugh. V.C. ¶ 21. Indeed, there is no other logical source for the "leak." Pricing information and customer contact information, such as that passed on and used by Kavanaugh, is indisputably covered by the Confidentiality and Nondisclosure Agreement entered into between Kavanaugh and Concepts, and is confidential. V.C. ¶ 47. See, e.g., Borden & Remington Corp. v. Banisch, No. A9901270, 1999 WL 1266161, at * 4 (Mass. Super. Ct. Oct. 18, 1999) (concluding that "information on prices, pricing strategies, identities of customers, and general marketing plans" was protected, confidential information and that preliminary injunction should be granted to protect that information). Kavanaugh therefore clearly breached the Agreement by virtue of his disclosure of this sensitive information to the Army. See Jensen Tools, Inc. v. Contact East, Inc., Civ. A. No. 92-10970-Z, 1992 WL 245693, at * 2 (D. Mass. Sept. 9, 1992) (granting preliminary injunction and stating: "Massachusetts law recognizes that a plaintiff may obtain relief from a defendant who wrongfully acquires plaintiff's confidential information, even if the information fails to qualify for protection as a trade secret."). Moreover, the Agreement prohibits Kavanaugh from using confidential information without Concepts' authorization. Kavanaugh clearly used the pricing information, along with the confidential customer

identification and contact information, in connection with his communications with the Army. Again, this is a clear breach of contract. The fact that Kavanaugh undertook these actions whilst still an employee only goes to highlight the egregious nature of Kavanaugh's breach. Concepts is therefore virtually certain to prevail on the merits.

In addition to its claim of breach of contract, Concepts has also brought claims of tortious interference, breach of the duty of loyalty, misappropriation of trade secrets, and Chapter 93A claims against Kavanaugh. Given the plain facts of this matter, it must be concluded that Concepts is likely to succeed on the merits of these claims as well. Concepts had a business relationship with the Army by which Concepts derived economic benefit. Kavanaugh was aware of this relationship, and interfered with the relationship through improper means, i.e. using Concepts' confidential information. Concepts has suffered a "loss of advantage [consideration as sole supplier and reputational harm] directly resulting from" Kavanaugh's actions. Adcom Products, Inc. v. Konica Business Machines USA, Inc., 668 N.E.2d 866, 869 (Mass. App. Ct. 1996). Concepts is therefore likely to succeed on its tortious interference claim. Kavanaugh's breach of his duty of loyalty to Concepts is likewise clear. See, e.g., Augat, Inc. v. Aegis, Inc., 565 N.E.2d 415, 419-20 (Mass. 1991) (addressing duty of loyalty, stating: "There are, however, certain limitations on the conduct of an employee who plans to compete with his employer. He may not appropriate his employer's trade secrets. He may not solicit his employer's customer's while still working for his employer, and he may not carry away certain information, such as lists of customers.") (citations omitted). Similarly, Concepts is likely to succeed on its misappropriation of trade secrets claim and its 93A claim. See, e.g., Juncker Assoc. & Co., Inc. v. Enes, No. 00-2098-C, 2002 WL 31104013 (Mass. Super. Ct. Sept. 5, 2002).

In short, Concepts has satisfied the first, and in some respects most significant, hurdle in establishing entitlement to a preliminary injunction.

C.     <u>Concepts Will Suffer Irreparable Harm If An Injunction Is Not Granted</u>

Concepts will manifestly suffer irreparable harm if an injunction is not granted, and Kavanaugh is allowed to continue to divulge and use Concepts' confidential information in a bid to sabotage Concepts' business, tarnish its reputation, and usurp its business. In the first place, the threat of disclosure of confidential information, in and of itself, is sufficient to satisfy the irreparable harm element for preliminary injunctive relief. See, e.g., Picker Int'l. Corp. v. Imaging Equip. Serv., Inc., 931 F. Supp. 18 (D. Mass. 1995); HighData Software Corp. v. Kothandan, 160 F. Supp.2d 167, 169 (D.N.H. 2001) ("Any significant violation of an enforceable noncompetition and nondisclosure agreement causes irreparable harm to the party seeking to promptly enforce the agreement."); Ticor Title Ins. Co. v. Cohen, 173 F.3d 63 (2d Cir. 1999); Pepsico, Inc. v. Redmond, No. 94 C 6838, 1996 WL 3965, at * 29 (N.D. Ill. Jan. 2, 1996) ("In cases such as this, involving threats to trade secrets and confidential information, courts readily presume irreparable injury from a showing that the protectible interest at stake is imperiled by a defendant's conduct."). In this case, Kavanaugh has already disclosed and used Concepts' confidential information in an attempt to sabotage its business. It is therefore clear that Kavanaugh has no qualms about violating the Confidentiality Agreement and using this confidential information to damage Concepts. The threat of Kavanaugh's future use of this information is therefore imminent. As stated, this alone satisfies the irreparable harm element.

In addition, Kavanaugh has used this information in an attempt to tarnish Concepts' reputation and to usurp its business. The Dynamometer market is relatively small and close knit. Because of this, Concepts' business reputation in that market is extremely valuable and

important. Kavanaugh has already damaged Concepts' reputation with the Army. V.C. ¶ 27. If Kavanaugh is allowed to continue to divulge and use Concepts' own confidential information in a calculated way to damage Concepts' reputation, the damage will be irreparable. Injury to reputation satisfies the irreparable harm requirement necessary to preliminary injunctive relief. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994) ("[T]he threat of a permanent loss of customers and the potential loss of goodwill . . . support a finding of irreparable harm."); Ross-Simmons v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996) (loss of goodwill taken into account in evaluating claim of irreparable harm); see also Foundry Servs., Inc. v. Beneflux Corp., 206 F.2d 214, 216 (2d Cir. 1953) (loss of goodwill to be taken into account) (Learned Hand, J., concurring). In order to stop damage to Concepts' reputation and goodwill before it continues, it is absolutely imperative that Kavanaugh be prohibited from further divulging and using Concepts' confidential information. An Order from this Court to that effect will preserve Concepts' reputation until it can be vindicated at trial.

As if the above were not enough, the irreparable harm element in this case has in fact been specifically conceded by Kavanaugh in the Confidentiality and Nondisclosure Agreement entered into with Concepts. As noted above, in that Agreement, Kavanaugh acknowledged:

> . . . that money damages may not adequately compensate CETI for any violation of this Agreement, or that money damages may not be readily calculable, and CETI therefore also reserves, in addition to all rights it has and may have in law or in equity, the right to enjoin, or seek damages or other remedies for, any actions violating this Agreement.

Kavanaugh has clearly breached the Confidentiality Agreement by his actions in this matter. As a result of that breach, it follows that Concepts is entitled to injunctive relief to enforce the terms of the Agreement. See, e.g., Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999) (finding of irreparable harm upheld based upon, among other things, a contractual admission that

breach of a non-compete agreement would cause irreparable harm). Accordingly, Concepts has established the second requirement for entitlement to a preliminary injunction in this case.

### D.  The Balance Of Equities Favors Concepts

The next requirement that Concepts must establish in order to obtain injunctive relief is that a balancing of the equities involved favors granting the requested injunction. Even a cursory review of the equities at issue here demonstrates that the balance of those equities undeniably favors issuance of an injunction. Kavanaugh agreed to keep Concepts' information confidential and agreed not to use that confidential information without Concepts' authorization. The injunction that Concepts requests would simply require Kavanaugh to stand by his earlier Agreement. Accordingly, issuance of the requested injunction cannot be said to have any deleterious effect on Kavanaugh. In contrast, the damage to Concepts if the injunction is not issued would be serious. The only reasonable conclusion that can be reached under the facts of this case is that the balance of equities clearly favors issuance of the injunction.

### E.  Considerations Of The Effect On The Public Interest Favor Issuance Of An Injunction

The present dispute is one between private parties, and the direct effect on the public interest of either an issuance or denial of an injunction is likely to be minimal. Nevertheless, to the extent the interest of the public is implicated in this matter, it is evident that considerations of the public interest favor issuance of an injunction. The law recognizes the value and utility of keeping confidential information confidential. The law also recognizes the importance of upholding agreements, such as the Confidentiality and Nondisclosure Agreement agreed to by Kavanaugh. The injunction sought by Concepts in this case would vindicate both the importance of maintaining confidentiality of proprietary information, and the importance of honoring contracts. The public interest is therefore served by issuance of an injunction.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Concepts respectfully requests that the Court issue an Order that: (1) enjoins Kavanaugh from <u>divulging</u> any of Concepts' confidential information to third parties without express, written authorization from Concepts, and (2) enjoins Kavanaugh from <u>using</u> any of Concepts' confidential information in competing against Concepts. In addition, Concepts seeks an order requiring Kavanaugh to return any and all documents and confidential and proprietary information of any nature pertaining to his work at Concepts. A proposed Order is attached hereto as Exhibit A.

Dated at Burlington, Vermont this 25th day of June, 2004.

DOWNS RACHLIN MARTIN PLLC

*[signature]*

Walter E. Judge, Jr.
Mass Bar No. 556650
Eric A. Poehlmann
Attorneys for Plaintiff Concepts ETI, Inc.
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

BTV.268794.2

DOWNS
RACHLIN
MARTIN PLLC

14